SUCESIÓN JOSÉ A. TORO MORALES ET AL., demandantes y peticionarios, *v.* SUCESIÓN DE NICOLÁS TORO CRUZ ET AL., demandados y recurridos.

*Número:* CC-2002-714          *Resuelto:* 17 de marzo de 2004

*Andrés García Arache*, abogado de la parte peticionaria; *Fernando L. Sepúlveda Silva*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

En el recurso de autos nos corresponde resolver si la cantidad que debe traer un heredero forzoso al caudal hereditario en un proceso de colación es el valor del bien donado al momento de la donación o su precio en el mercado cuando se divide la herencia.

Los integrantes de la sucesión Toro-Morales solicitan que revoquemos las decisiones del Tribunal de Circuito de Apelaciones y del Tribunal de Primera Instancia, que concluyeron que el Art. 999 del Código Civil dispone que para efectos de la colación se computaría el valor del bien donado al momento del acto de liberalidad a una de las herederas y no su precio en el mercado al momento de la partición del caudal de su padre. Confirmamos.

## I

Don Nicolás Toro Cruz falleció intestado en Mayagüez, Puerto Rico, el 17 de noviembre de 1991. Al momento de su fallecimiento había procreado trece hijos producto de tres relaciones distintas.

En su primer matrimonio, con la Sra. Gloria Morales, procreó tres hijos: Feliberto, Gladys y José A., todos de apellidos Toro Morales. A José A., ya fallecido, le sobrevivieron su cónyuge Myrtelina Carlo y sus hijos Vanesa Toro Carlo y José A. Toro Carlo. Todos ellos componen la parte demandante peticionaria.

Luego de su divorcio de la Sra. Gloria Morales, el señor Toro Cruz contrajo matrimonio con la Sra. Isabel Asencio, con quien procreó ocho hijos, cuyos nombres son los siguientes: Cynthia, Nicolás E., Santos Antonio, Eva I., Evelyn, Madelline, Ana Dora y Earline, todos de apellidos Toro Asencio. Además, como resultado de sus relaciones extra-

maritales, Don Nicolás Toro Cruz procreó dos hijos adicionales, Ricardo A. Toro Torres y Waldemar Toro Torres.

Los hijos de su primer matrimonio (Sucesión Toro Morales), presentaron una demanda sobre división de bienes contra los integrantes de las sucesiones Toro Asencio y Toro Torres. Alegaron haber sido adversamente afectados en sus derechos hereditarios por una compraventa llevada a cabo entre una de las codemandadas, Cynthia Toro Asencio, y sus padres, Nicolás Toro Cruz e Isabel Asencio. Adujeron que en la mencionada compraventa hubo una donación subyacente, ya que el valor de la propiedad vendida por el matrimonio Toro-Asencio era mayor al valor pagado por la codemandada y compradora Cynthia Toro Asencio.[1] Eventualmente, los demandantes desistieron de su reclamación contra los otros demandados, quedando Cynthia Toro Asencio solamente como parte demandada.

En miras a una transacción, y luego de múltiples incidentes procesales y de varios estudios de valoración, las partes acordaron que el tasador Félix J. Rodríguez valorara la propiedad en controversia; el resultado de esa tasación, según estipularon, sería obligatorio para las partes.

Posteriormente, y tras la repetida cercanía de una posible transacción que nunca se materializó, el Tribunal de Primera Instancia, Sala de Mayagüez, señaló el asunto para juicio. A tales efectos, las partes presentaron al foro de instancia varias estipulaciones de hechos *y tres informes de valoración* de la finca objeto de controversia preparados por diversos peritos en fechas distintas.

Entre los hechos estipulados por las partes, se señaló que la propiedad había sido vendida en 1987 a la parte demandada por la suma de cincuenta y cinco mil dólares. Se estipuló, además, que la propiedad había sido valorada

---

[1] Es menester señalar que el caudal del Sr. Nicolás Toro Cruz *ya fue dividido* entre sus herederos. Por lo tanto, de estimar este Tribunal que los integrantes de la sucesión Toro-Morales tienen derechos hereditarios sobre el bien en cuestión, esa cantidad será devuelta directamente a los demandantes y no al caudal relicto, ya que éste, en efecto, fue repartido.

en *tres* ocasiones distintas. El valor de la propiedad, naturalmente, varía sustancialmente según la fecha en que se realizó la tasación.

El primer estudio de tasación sobre el bien en controversia lo procuró la parte demandante y efectuado por el Sr. Rafael Arcaya Cruzado el 3 de marzo de 1995. Dicho estudio arrojó un valor, a esa fecha, de quinientos treinta seis mil dólares.

El segundo estudio de tasación lo procuró la parte demandada, quien solicitó un estudio de valoración retroactivo a la fecha de la compraventa, es decir a 1987. Dicho estudio lo llevó a cabo el Ing. Rafael Blanes el 18 de agosto de 1998, *y arrojó un valor retroactivo al 31 de agosto de 1987* de doscientos cincuenta y ocho mil quinientos dólares.

La tercera valoración del bien en cuestión, según mencionáramos anteriormente, la procuraron ambas partes y la realizó el evaluador profesional Félix J. Rodríguez el 24 de febrero de 2000. Dicha valoración arrojó un valor de la propiedad, a esa fecha, de ochocientos treinta y tres mil dólares.

Luego de los procedimientos de rigor, el Tribunal de Primera Instancia resolvió que el negocio realizado sobre la propiedad en controversia fue una compraventa en cuanto a la porción onerosa del contrato y una donación en cuanto al resto de la transacción, por lo que aplicó, en cuanto a esa porción, el derecho aplicable a las donaciones. En lo referente al cómputo del correspondiente derecho hereditario de las partes, el tribunal utilizó como fundamento el costo en el mercado de la propiedad para 1987. Es decir, resolvió que para propósitos de la colación, se debe utilizar el valor de la propiedad al momento de la donación.

Así, estimó que la diferencia en precio entre la cantidad pagada, cincuenta y cinco mil dólares, y el valor del bien al momento de la donación, doscientos cincuenta y ocho mil dólares, era de doscientos tres mil quinientos dólares. Di-

cho bien, no obstante, era ganancial al momento de la donación, por lo que los demandantes, quienes sólo tienen derechos hereditarios sobre la mitad del señor Toro, tienen derecho, cada uno, a una treceava parte de la mitad de la cantidad donada. En otras palabras, tienen derecho a una treceava parte de ciento un mil setecientos cincuenta dólares, que es la parte que le pertenecía al señor Toro. Luego de los cálculos de rigor, el Tribunal de Primera Instancia estimó que cada uno de los demandantes tiene derecho a la suma de siete mil ochocientos veintisiete dólares.

Inconforme con la determinación, la Sucesión Toro Morales apeló al Tribunal de Circuito de Apelaciones quien, a su vez, confirmó el dictamen del foro de instancia. Es de esta determinación que acude ante nos la sucesión, aduciendo que incidió el foro apelativo al confirmar la sentencia del Tribunal de Primera Instancia que decretó que la cantidad a colacionar es el importe del bien donado al momento de la donación. Sostienen también que el Tribunal de Circuito de Apelaciones se equivocó al resolver que no estaban obligados a acatar la tasación de febrero de 2000, cuando ésta fue producto de una estipulación entre las partes.

Ante este cuadro fáctico, analicemos el derecho aplicable a la situación de autos.

## II

■    De entrada, debemos precisar que el negocio en cuestión es una compraventa legal que incluye una donación subyacente. Ya antes habíamos señalado que un contrato de compraventa donde haya una donación subyacente se reputa válido conforme al Art. 1226 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 3431, siempre que en él concurran los requisitos siguientes: (1) que el contrato otorgado que la encubre se haya otorgado mediante una escritura pública; (2) que se describan individualmente los

bienes donados y, en caso de donación onerosa, que se expresen las cargas que el donatario asume, y (3) que se haga constar la aceptación del donatario en ella en una escritura separada, pudiendo deducirse tal aceptación de la firma del documento simulado. *La Costa v. La Costa*, 112 D.P.R. 9 (1982); *Hernández Usera v. Srio. de Hacienda*, 86 D.P.R. 13, 18 (1962).

En una situación como la de autos, donde el precio pagado por la propiedad es menor al valor justo en el mercado al momento del negocio jurídico, la diferencia entre estas cantidades constituye una donación si cumple con los requisitos antes esbozados, y es hecha de buena fe y sin intención de defraudar a los herederos legítimos. En tal eventualidad, existiría causa para ambos contratos: en la compraventa sería el precio pagado y en la donación la mera liberalidad del donante.

En el caso de marras, las partes están de acuerdo en que en el contrato de compraventa hubo una donación subyacente y que la transacción es válida. Dicho contrato fue realizado mediante una escritura pública, se describió el bien inmueble y se aceptó, por medio de la firma, la donación. Además, nunca se presentó prueba tendente a demostrar que la donación se hizo de mala fe o con intención de defraudar a los herederos legítimos.

Así, y debido a que no existe controversia en cuanto a la validez del negocio jurídico entre el matrimonio Toro-Asencio y su hija Cynthia Toro Asencio, queda por precisar la cantidad que le fue donada a la demandada de forma subyacente mediante el referido contrato de compraventa, para así determinar la cantidad que ésta debió colacionar en el proceso de partición de la herencia.

## III

A. Según mencionamos anteriormente, la controversia medular del caso de marras requiere que interpretemos el

Art. 999 del Código Civil, 31 L.P.R.A. sec. 2851, y determinemos cuál es la fecha que se utilizará para determinar el valor de la propiedad donada para propósitos de la colación; el momento de la donación o el momento de la partición del caudal.

En su alegato ante nos, la Sucesión Toro Morales sostuvo que para determinar la cuantía de los derechos hereditarios se debe utilizar el valor en el mercado de la propiedad al momento de la partición. Añaden, además, que la última tasación que efectuó en el 2000 el Sr. Félix J. Rodríguez era obligatoria para las partes, y no se podía sustituir por otro informe de valoración. En la alternativa, aducen que de este Tribunal estimar que el valor a utilizarse al momento de la colación es aquel que tenía el bien al momento de la donación, procede retrotraer la cantidad señalada en el estudio de valoración del 2000 a la fecha de la donación.

Por su parte, la donataria sostiene que el momento a considerar para determinar el valor del bien hereditario en controversia es el de la donación.

■ El Art. 989 de nuestro Código Civil, 31 L.P.R.A. sec. 2841, dispone, en esencia, que el heredero forzoso que concurra con otros deberá traer a la masa hereditaria los bienes que en vida recibió del causante por donación u otro título lucrativo. Ello, con el fin de que estos bienes sean computados en la división de las legítimas.

La colación, como es conocido ese proceso, es un procedimiento de mera contabilidad mediante el cual se añaden al caudal hereditario los importes de las donaciones que en vida otorgó el causante a los herederos legitimarios. Esta operación tiene como fin procurar entre los herederos forzosos un trato equitativo porque se presume que el causante no quiso tratarlos de forma desigual. Así, la donación otorgada a uno de ellos se considera un anticipo de su futura cuota hereditaria, salvo que el causante manifieste lo contrario y dispense de colacionar al donatario.

A falta de dispensa, el donatario quien a su vez sea heredero forzoso, tomará de menos en la división de la herencia, según lo que haya recibido en vida; recolectando sus coherederos el equivalente, según sea posible, en bienes de la misma naturaleza, especie y calidad. Véase Art. 1001 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2852.

Ahora bien, respecto a la forma de calcular lo que el donatario recibió en vida, cabe señalar que se ha generado una controversia doctrinal, tanto en España como en nuestra jurisdicción, en cuanto a si se debe tomar en consideración el valor original de la donación o el valor presente de esa cantidad, a la luz del cambio de valoración en la moneda y en la economía. Es decir, el valor del bien al momento de la donación o el valor efectivo actual tomando en consideración la oscilación de la moneda. Véase J.B. Vallet de Goytisolo, *Estudios de Derecho Sucesorio*, Madrid, Ed. Montecorvo, 1982, Vol. IV, págs. 379–380.

A tales efectos, Roca Sastre, quien estima que en la partición se debe computar el valor *nominal*,[2] o valor original, que tenían los bienes colacionables al momento de hacerse la donación, señala lo siguiente:

> Las cosas objeto de la liberalidad colacionable, se estiman por el valor que tenían al tiempo de otorgarse efectivamente la liberalidad, o sea de efectuarse la entrega o inversión, aunque no se hubiese hecho entonces su justoprecio. *No se tiene en cuenta la depreciación monetaria, salvo que se hubiere establecido cláusula de estabilización.* El aumento como el deterioro posterior, y aun la pérdida total, causal o culpable, del objeto de la liberalidad colacionable, será a beneficio o a cargo y riesgo del donatario. (Énfasis suplido.) L. Enneccerus, *Tratado de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1976, T. V, Vol. 2, pág. 312.

Por el contrario, Núñez Lagos, Vallet y LaCruz Berdejo,

---

[2] Cabe señalar que los comentaristas españoles llaman valor "nominal" al valor que hemos denominado como valor "original"; es decir, el valor del bien al momento de la donación. Por otro lado, la tradición civilista denomina valor "real" al valor "presente" de esa cantidad. A este último también se le conoce como "valor actuarial".

según citados por Puig Brutau, estiman que " 'se trata de un ... *quantum* del activo hereditario. Es, pues, una deuda de cantidad, en la subclase de deuda de valor' ", por lo que su cuantía deberá ser " 'la concurrente para compensar el valor *real*[o presente], según los números índice en el momento de la donación, de los bienes donados en vida por el causante' ". (Énfasis en el original.) J. Puig Brutau, *Fundamentos del Derecho Civil*, 2da ed. rev., Barcelona, Ed. Bosch, 1985, T. V, Vol. 3, pág. 643. En otras palabras, hay que estimar el valor de lo donado en el momento del acto de liberalidad, pero con arreglo a las circunstancias monetarias del día del fallecimiento. F. Puig Peña, *Compendio de Derecho Civil Español*, Madrid, Eds. Pirámide, 1976, pág. 100.

De esta manera, según LaCruz Berdejo, se mantiene el valor del bien al momento de la donación, según exige la ley, a la vez que se evita que por pérdida del valor de la moneda quede la cantidad originalmente colacionable muy por debajo del valor real del bien. Esto supone cierta igualdad de valor entre el bien donado y los bienes que, de la misma especie, existan aún en la herencia. Véase Puig Brutau, *op. cit.*, pág. 643.

A raíz de esta disputa doctrinal, en 1981 el legislador español enmendó el Art. 1.045 de su Código Civil, correspondiente al Art. 999 del nuestro, 31 L.P.R.A. sec. 2851, para que dispusiese así:

> No han de traerse a colación y partición las mismas cosas donadas, *sino su valor al tiempo en que se evalúen los bienes hereditarios.*
> El aumento o deterioro físico posterior a la donación y aun su perdida total, causal o culpable, será a cargo y riesgo o beneficio del donatario. (Énfasis suplido.)

Como bien explica el Prof. Efraín González Tejera, a partir de la reforma del derecho de sucesiones español de 1981, los bienes donados se evalúan al hacerse la partición, pero tal como se recibieron al momento de la donación. E.

González Tejera, *Derecho de Sucesiones*, Río Piedras, Ed. Universidad de Puerto Rico, 2001, T. I, pág. 526. En otras palabras, en España se colaciona una cantidad actual que iguale el poder adquisitivo que tenía la cantidad donada al momento de la donación. Íd., citando a O'Callaghan.

Es preciso aclarar, no obstante, que en Puerto Rico *no se ha incorporado* la enmienda que sufrió el Art. 1.045 español, por lo que el Art. 999 de nuestro Código Civil, *supra*, sigue estableciendo lo siguiente:

> No han de traerse a colación y partición las mismas cosas donadas o dadas en dote, *sino el valor que tenían al tiempo de la donación* o dote, aunque no se hubiese hecho entonces su justiprecio. (Énfasis suplido.) 33 L.P.R.A. sec. 2851.

Según se puede apreciar, nuestro Código Civil establece *clara e inequívocamente* que para propósitos de la colación se tomará en consideración el *valor que tenía el bien al momento de la donación*.[3] Ello, sin abstracción de las vicisitudes posteriores en el valor del bien o de la moneda.[4] De estimar el donante que el valor del bien debe ajustarse a las fluctuaciones monetarias, deberá especificarlo así al momento de la donación.[5]

Según es sabido, es un principio establecido de hermenéutica judicial que ante un lenguaje claro e inequívoco del legislador, el texto de la ley es la expresión por excelencia de la intención legislativa. Por otro lado, es de

---

[3] *Si bien es cierto que el profesor González Tejera discrepa de la teoría del valor nominal, no es menos cierto que ese autor acepta que el Art. 999 de nuestro Código Civil, 31 L.P.R.A. sec. 2851, limita la obligación del donatario al valor nominal de lo donado a la fecha de la donación.* E. González Tejera, *Derecho de Sucesiones*, Río Piedras, Ed. Universidad de Puerto Rico, 2001, T. I, pág. 526.

[4] Se debe tomar también en consideración que Puerto Rico no confronta los mismos problemas que las naciones europeas con relación a la oscilación del valor de la moneda, factor importante que tomaron en cuenta los legisladores españoles al enmendar su código.

[5] Nuestra Asamblea Legislativa ha optado por no enmendar el referido artículo, *a pesar de que conoce de la enmienda llevada a cabo en el Código Civil español.* Así se deduce del estudio preparado por la *Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico.*

general conocimiento que "[l]as palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación", atendiendo al uso general y popular de las voces. Véase Art. 15 del Código Civil, 31 L.P.R.A. sec. 15. El lenguaje de la frase *"valor que tenía el bien al momento de la donación"* es inequívocamente patente, por lo que no se debe interpretar de otra manera.

Queda, pues, meridianamente claro que el valor que se utilizará al momento de colacionar *es el valor que tenía el bien al momento de la donación* y no al momento de la partición, según alegan los peticionarios.(6)

B. En el caso de autos, el matrimonio Toro-Asencio le vendió a su hija Cynthia una finca de cuarenta y uno punto noventa y dos cuerdas sita en el Barrio Boquerón de Cabo Rojo por el precio de cincuenta y cinco mil dólares. No está en discusión la existencia de una donación subyacente válida dentro del contrato. Tampoco está en controversia que la diferencia entre el valor del bien en aquel momento y la cantidad pagada por la demandada constituye una donación que, por ser en efecto un adelanto de la legítima de una heredera forzosa, era colacionable.

Por otro lado, las partes estipularon que hubo tres valoraciones distintas del bien en cuestión. Una llevada a cabo en 1995 que arrojó un valor de quinientos treinta y seis mil dólares. Otra llevada a cabo en 1998, *pero ajustada a 1987, momento en que se llevó a cabo el negocio jurídico entre la demandada y sus padres*, que arrojó un valor de doscientos cincuenta y ocho mil dólares. Y una última valoración efectuada en el 2000 que arrojó un valor de ochocientos treinta y tres mil dólares.

Según señalamos anteriormente, el Art. 999 de nuestro Código Civil, *supra*, establece que para propósitos de la

---

(6) La parte demandante sostiene que el valor de los bienes hereditarios se calcula al momento de la partición. Cabe señalar, no obstante, que la finca en controversia *ya no era parte del caudal hereditario* porque había sido vendida a la señora Cynthia Toro, por lo que no puede computarse como parte del caudal relicto.

colación, el valor que se debe utilizar es aquel que tenía el bien donado al momento del acto de liberalidad. De las tres tasaciones, la *única* que se remonta a la fecha de la donación es la que efectuó el Sr. Rafael Blanes en 1998, la cual arrojó un valor nominal a 1987 de doscientos cincuenta y ocho mil dólares, por lo cual es esa la cantidad que se debió utilizar al momento de determinar el valor del bien donado para propósito de la colación.[7]

C. Por otro lado, no le asiste la razón a la Sucesión Toro-Morales (parte demandante) al sostener que el juzgador está obligado a acatar el informe de valoración del 2000 que valoraba el bien donado en ochocientos treinta y tres mil dólares. Máxime cuando así hacerlo contravendría el derecho vigente que dispone que el valor del bien donado se calcula al momento del acto de liberalidad. Cabe señalar que el acuerdo al que hace referencia la parte demandante se dio en miras a una transacción que nunca se configuró, por lo que no puede obligar al juzgador del caso de autos.[8]

De los autos del recurso surge que previo a la vista del caso en su fondo, las partes sometieron sendos memorandos de derecho con varias estipulaciones, entre las cuales se estableció que se hicieron *tres* valoraciones del bien inmueble. Además, la parte demandante aceptó en un escrito posterior que presentó ante el foro de instancia que existían tres valoraciones distintas del bien en cuestión, sin argumentar en momento alguno que el juzgador estaba

---

[7] Claro está, a esta cantidad se le restará la cantidad que pagó la demandada.

[8] Según mencionáramos, las partes estipularon que el Sr. Félix J. Rodríguez llevara a cabo una valoración del bien en cuestión. Esa tasación arrojó un valor para el 2000 de ochocientos treinta y tres mil dólares. Nadie está cuestionando que ese era el valor de la propiedad para ese momento. Sin embargo, la controversia de autos precisa determinar *la cantidad que la demandada ha de colacionar.* La cantidad que la demandada ha de colacionar dependerá, necesariamente, del valor del bien *al momento de la donación.* No olvidemos que los demandantes siempre estimaron que la cantidad a colacionar dependería del valor del bien al momento de la partición, por lo que era sumamente importante para su argumento que el valor utilizado fuera el de la tasación más reciente. Además, de ser cierto el argumento de la parte demandante, esa estipulación hubiese dispuesto del caso en su totalidad, por lo que hubiese sido innecesario llevar a acabo un juicio en su fondo.

obligado por la última tasación o que estaba en desacuerdo con el resultado del estudio que llevó a cabo el Sr. Rafael Blanes.[9] Por lo tanto, decretamos que actuó correctamente el tribunal a quo al rechazar el argumento de la parte demandante recurrente de que el estudio de valoración del año 2000 era obligatorio, tanto para las partes como para el juzgador de autos.

D. Por último, tampoco tiene razón la Sucesión Toro-Morales al estimar que en la alternativa de que, contrario a lo que ellos estiman, este Tribunal decrete que el valor del bien es aquel que tenía al momento de la donación, procede en derecho utilizar la valoración que se hizo en el 2000 y retrotraerla a la fecha de la donación utilizando un "Ajuste de Tiempo Retroactivo" de tres punto cinco por ciento anual. Este cómputo, según la parte demandante, arroja un valor de la propiedad a 1987 de $523,617.70.[10] Valor, según ellos, muy superior al señalado por el señor Blanes en su estudio de valoración.

Según aclaráramos previamente, no estamos obligados por el estudio de valoración del 2000. Por otro lado, cabe señalar que el valor de un bien inmueble a una fecha pasada no se calcula según lo estima la parte demandante. Es decir, no se utiliza un cómputo automático y generalizado donde se descuenta del valor actual del bien el cambio promedio porcentual anual. El producto de ese cálculo sería incorrecto e impreciso ya que, entre otras cosas, le adjudicaría a la propiedad un valor a 1987 que toma en consideración los aumentos posteriores y naturales de los bienes inmuebles.[11]

---

[9] Véase Memorando de la Parte Demandante, Apéndice, pág. 138, que dispone así: "Hay tres (3) evaluaciones que demuestran fluctuaciones considerables en los valores desde la muerte del causante hasta el presente, y que se extenderá hasta que se efectúe la partición, y que deben aprovechar a todos los herederos."

[10] Este cómputo fue hecho mediante un "Ajuste de Tiempo Retroactivo" o "cambio promedio porcentual anual" de tres punto cinco por ciento.

[11] Tomemos como ejemplo una propiedad a la que luego de quince años de donada, le construyen en un área cercana un complejo turístico de lujo. Esa propie-

Por el contrario, según se deduce del Informe del ingeniero Blanes, un estudio de valoración retroactivo debe tomar en consideración las ventas de propiedades similares en el mismo vecindario con usos y fines parecidos a la propiedad evaluada para la fecha en cuestión[12] (las llamadas ventas comparables); el valor depreciado de las mejoras de esa propiedad, más el valor del terreno fundamentado en ventas de propiedades parecidas[13], o la capacidad de generar rentas netas en el mercado típico en que se encuentra si la propiedad está expuesta a ese mercado de rentas.[14] Estos estudios toman en consideración, además, otros factores como la localización y el uso más provechoso de la propiedad, entre otros factores.[15] Véase Informe de Valoración del señor Blanes.

Por lo tanto, queda meridianamente claro que la Sucesión Toro-Morales no tiene razón la Sucesión Toro-Morales al estimar que el valor del bien en cuestión a la fecha de la donación era $523,617.70, sin tomar en consideración, al efectuar el cómputo que propusieron, las distintas variables que se deben estudiar al estimar el valor de una propiedad para un momento pasado específico.[16]

---

dad, naturalmente, aumentará sustancialmente de valor como consecuencia de la construcción. Si tomamos el valor de la propiedad luego de la construcción del complejo turístico, y le hacemos un "Ajuste de Tiempo Retroactivo", según sugiere la parte demandante, el valor del bien al momento de la donación sería artificialmente alto, ya que se tomó en consideración el aumento posterior del bien. Esta suma no refleja la cantidad real que una persona hubiese pagado por esa propiedad hace quince años.

[12] Éste es el llamado "enfoque de ventas o mercadeo".

[13] Éste es el llamado "enfoque de costo o reproducción", en el cual es menester que el terreno esté en su mejor o más provechoso uso, y que las mejoras existentes guarden relación con el mejor uso del terreno.

[14] Éste es el llamado "enfoque de renta o capitalización".

[15] El ajuste de tiempo retroactivo es sólo de múltiples cómputos utilizados en un estudio de valoración.

[16] Aceptar ese cómputo significaría que el bien en cuestión sólo aumentó $12,382.30 en un período de ocho años. Ello, ya que el estudio de valoración de la propia parte demandante de 1995 estimó que el valor de la propiedad a esa fecha era de $536,000.

IV

No albergamos dudas sobre la validez del estudio de valoración retroactivo que efectuó el ingeniero Blanes. Tampoco alojamos dudas a los efectos de que los foros a quo no estaban obligados, como tampoco lo estamos nosotros, a acatar el estudio de valoración de febrero de 2000. Por último, consideramos que procedieron correctamente el tribunal de instancia y el foro apelativo al estimar que la cantidad que debe traer un heredero forzoso a la masa hereditaria para efectos de la colación es el valor que tenía el bien donado *al momento del acto de liberalidad.*

En el caso de marras, la cantidad donada asciende a doscientos tres mil quinientos dólares.(17) Por lo tanto, actuaron correctamente el Tribunal de Circuito de Apelaciones y el Tribunal de Primera Instancia al resolver que cada uno de los demandantes tiene derecho a la suma de siete mil ochocientos veintisiete dólares.

Por los fundamentos antes expuestos, *procede confirmar los dictámenes del Tribunal de Circuito de Apelaciones y el Tribunal de Primera Instancia, y se devuelve el recurso para que se prosiga de forma compatible con lo aquí resuelto.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión disidente, a la cual se unió la Juez Asociada Señora Fiol Matta.

---

(17) Esa cantidad surge al restar del valor total del bien en cuestión la cantidad que pagó la demandada en 1987.

— O —

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri, a la cual se une la Juez Asociada Señora Fiol Matta.

Al interpretar el significado y alcance del Art. 999 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2851, *es meridianamente claro* que para colacionar los bienes donados se ha de tomar su valor al momento de la donación *y no su valor actual en el mercado.* Así, pues, en un caso como el de autos, al hacer la colación correspondiente no se puede tomar la suma de $833,000 —calculada por un evaluador profesional— como el valor actual en el mercado del bien donado. El propio Código *y la doctrina coinciden, uniformemente,* en que al colacionar el bien donado, es menester tomar su valor en el momento en que se hizo la donación, de modo que lo que el valor del bien en cuestión haya aumentado durante el lapso de tiempo entre la donación y la muerte del causante, le beneficia al donatario.

Así, pues, como tantas veces ha sucedido en Puerto Rico, si una finca o un solar era de naturaleza agrícola al momento de la donación, pero décadas más tarde esa finca o solar se ha convertido en una codiciada propiedad turística, industrial o comercial, la correspondiente multiplicación de su valor como resultado del referido cambio en las circunstancias, le beneficia al donatario, tal como le beneficiarían las ganancias obtenidas de los frutos agrícolas, de haberse cultivado esa propiedad para tales fines durante el tiempo en cuestión. Sobre el referido aumento en valor, no puede existir controversia porque el derecho aplicable es claro.

Ahora bien, el Art. 999 del Código Civil, *supra,* sí presenta una cuestión —*que se parece pero realmente es muy distinta a la mencionada en los dos párrafos anteriores*— sobre la cual existe alguna división entre las voces más autorizadas del Derecho Civil. Esa cuestión es la de *cómo*

*se determina el valor de la propiedad donada al momento de la donación.* Específicamente la cuestión es si se debe tomar en cuenta su *valor nominal* al momento de la donación, o si, en cambio, se debe tomar en cuenta su *valor real* en ese momento. La cuestión surge, no por razón de que con el paso del tiempo haya ocurrido una transformación en la *utilidad* de la propiedad, que es lo que se señaló antes, sino porque con el pasar del tiempo *la moneda se ha devaluado,* de manera tal que su valor nominal no corresponde ya al valor real que tenía en aquel momento. Dicho de manera sencilla, el problema surge porque *un dólar hoy no vale lo mismo que valía un dólar hace veinticinco años.* Así, pues, para ilustrar concretamente el asunto, décadas atrás con un dólar se compraban varios galones de gasolina, mientras que ahora con un dólar sólo se compran unos pocos litros. Décadas atrás con un dólar se compraban cuatro docenas de huevos, mientras que ahora un dólar no da ni para una docena. Décadas atrás una finca que valía, digamos, $100,000 constituía una fortuna; hoy con $100,000 escasamente se puede comprar una residencia de bajo costo en una modesta urbanización.

La cuestión debatida en la doctrina sobre el asunto que aquí nos concierne es si al determinar el valor de la propiedad donada al momento de la donación, se toma en cuenta el costo que tenía en esa época a base de lo que representaba la moneda entonces (valor real) o si se va a tomar ese costo a base de lo que representa la moneda actualmente (valor nominal). Si el costo de la propiedad entonces fue de $100,000, *la cuestión es si se colaciona la propiedad a base de lo que significaba $100,000 entonces (valor real) o si se hace a base de lo que significan $100,000 actualmente (valor nominal).*

La opinión sobre el asunto referido prevaleciente entre la *inmensa mayoría* de la crítica erudita es que lo justo y propio es que se haga la colación a base del *valor real* del bien donado al momento de la donación. Eso quiere decir,

en el ejemplo anterior, que se le asigne ahora en la colación al inmueble que costó $100,000 un precio que refleje realmente lo que significaban $100,000 en la época en que se hizo la donación. Tal es la postura para *casos como el de autos*[1] de numerosos eminentes comentaristas del Derecho Civil como son Manresa, LaCruz Berdejo, Núñez Lagos, Vallet de Goytisolo, Puig Peña y Puig Brutau. Es, además, la postura prevaleciente de la doctrina alemana, expuesta por Kipp y otros eminentes juristas de ese país, según lo relata Puig Peña en su libro *Compendio de Derecho Civil Español*, 3ra ed. rev., Madrid, Ed. Pirámide, 1976, Vol. VI, pág. 101. Es, así mismo, la posición que González Tejera favorecería aquí en Puerto Rico (E. González Tejera, *Derecho de Sucesiones*, San Juan, Ed. Universidad de Puerto Rico, 2002, T. II, págs. 472–473).

La postura de tantos eminentes comentaristas del Derecho Civil referida anteriormente tiene una razón de ser clara e importante. Se trata de un mecanismo —la colación— que existe en el ordenamiento jurídico precisamente *para proteger la legítima de los herederos forzosos*. En nuestro sistema legal, como en otros de enfoque civilista, si el causante no dispone lo contrario, prevalece el principio medular de que la donación que un causante hace en vida a sus herederos forzosos se realiza *a cuenta de la cuota hereditaria de esos herederos*. Se considera como un adelanto que el causante les hace. Para darle efectividad a ese principio fundamental, el ordenamiento civilista establece el mecanismo de la colación al momento de la partición. Todo este entramado de nuestro derecho sucesorio perdería su propósito esencial de proteger la legítima si el bien donado se colaciona a base de su valor nominal en aquellos casos como el de autos, en los cuales el valor de la moneda se ha deteriorado sustancialmente por el largo lapso de

---

[1] Es menester aclarar que algunos de estos comentaristas, como Vallet de Goytisolo y Puig Peña, tienen una posición distinta *en otras circunstancias*. Pero, *en casos como el de autos*, su parecer claramente coincide con el de los que apoyan el criterio del valor real del bien donado.

tiempo transcurrido entre la fecha de la donación y la fecha de la muerte del causante. Como bien lo indica González Tejera en su obra citada antes, si se mantiene el valor nominal de la donación al momento de la partición, eso *"llevaría a una endeble justicia distributiva de la legítima en nuestro medio porque ... el donatario ... muchas veces colacionaría una cifra ridículamente baja en comparación con el valor total recibido"*. (Énfasis suplido.) Quedaría seriamente menoscabada la legítima de los herederos forzosos, a pesar del alto valor que tiene la normativa del propio Código Civil que procura evitar la preterición del heredero forzoso.

En el caso de autos, la mayoría del Tribunal no ofrece ningún raciocinio adecuado para apartarse de lo que postulan la mayoría de los más eminentes civilistas sobre el asunto en cuestión. El equívoco señalamiento de que su postura la requiere el citado Art. 999 de nuestro Código Civil está contradicho precisamente por la controversia doctrinal a la que alude la mayoría del Tribunal en su opinión sobre el asunto. Esa controversia trata específicamente sobre cómo se debe interpretar la norma que contiene el referido Art. 999. Por eso no se puede decir lógicamente que ese artículo ordena aquello que es precisamente objeto de una histórica controversia sobre lo que dispone.

El resultado neto de la postura mayoritaria en el caso de autos es que, en palabras de González Tejera, se hace una *"endeble justicia"* a los herederos peticionarios, y una vez más se ofusca infundadamente nuestro ordenamiento jurídico sucesorio, a costa de los derechos de los herederos forzosos. Por todo esto, disiento.